(Decided 20th January, 1869.)

---

THE WASHINGTON FIRE INSURANCE COMPANY *vs.*
WM. DAVISON AND WM. STUART SYMINGTON.

*Insurance against Fire — Construction of the term
"Carpenters" in a Policy of Insurance—Evidence
— An Insurer presumed to know the Nature and
Extent of the Risk he assumes—Construction of a*

Washington Fire Insurance Company *vs.* Davison and Symington.

*Policy of Insurance — Constructive notice to the Company of an alteration in a Policy of Insurance.*

In the absence of any express provision on the subject in a policy against fire, the making of repairs or additions to, or the erection of adjacent buildings, whereby there was a material increase of risk by fire, to the property insured, will not prevent a recovery unless the loss was produced in whole or in part by such increase of risk.

The term "Carpenters," employed in the third section of the seventeenth condition of the Policy of Insurance, entitled "Risks — specially hazardous," is simply a prohibition on the use of the insured premises, for the purpose of carrying on therein the work or business of a carpenter, or converting them into 'a carpenter's shop; it has no reference or application to the erection by carpenters of an adjacent building on adjacent ground, when the insured premises are not used by them as a workshop, for that purpose. To avoid the policy under this condition, the insured premises must themselves be used for the purpose of carrying on the prohibited trade.

Evidence by the Insurance Company through its secretary as an expert, to show that the term "Carpenters" used in its policy was generally understood, in the office of the company, to refer to the employment and work of carpenters in erecting or adding to buildings insured, is inadmissible.

If a witness swear that he was present on a certain occasion when a particular act was done and a particular remark was made, and the opposite party proves that he was not present, such proof goes to impeach the credibility of the witness, and his testimony may be corroborated by proof of his prior declarations in regard to the alleged act and remark.

An objection to a question as leading, must be made before it has been answered.

An insurer taking a risk upon a Sulphuric Acid Manufactory, is presumed to know and to have contemplated all the casualties and incidents to which the subject insured might be liable as such manufactory, and to have known all the requisites and adjuncts belonging thereto; and if he inspects the premises by himself or his agents, he has notice of all an expert ought to know from such inspection, and is bound by knowledge to that extent, and cannot set up in defence the ignorance or incapacity of the inspectors he employs.

The Wash. Fire Ins. Co. having been applied to for insurance on certain property, for its own convenience and without the request or authority

Washington Fire Insurance Company *vs.* Davison and Symington.

of the party seeking the insurance, applied to the Md. Fire Ins. Co. to share the risk; the premises were examined by the secretaries of the two companies together, with a view of taking the risk conjointly; both policies as originally drawn were precisely similar, of the same date, for the same amount, and both were altered in the same particulars before the premiums were paid, which were paid to both companies on the same day. HELD:

That the policy issued by the Md. Fire Ins. Co. was neither *prior* nor *subsequent* to the policy issued by the Wash. Fire Ins. Co., but took effect contemporaneously with it; and therefore the non-endorsement in writing on the policy issued by the Wash. Fire Ins. Co., that another insurance had been effected in the Md. Fire Ins. Co., did not render the former policy void under the proviso contained therein, that "if any other insurance *has been* or shall *hereafter* be made on the said property," without the consent of the company in writing endorsed thereon, the policy shall be void.

An alteration was made in a policy of insurance by a clerk whose authority to do so was denied by the company, who also denied all knowledge of the alteration until after the fire which destroyed the insured premises; at the time of making the alteration, the clerk made a corresponding alteration in the record of the policy in the record book, in which all policies issued by the company were recorded. HELD:

That the record in the books of the company kept by it for the sole purpose of recording its policies, was constructive notice to the company, by which it was as effectually bound as by actual notice.

A policy of insurance, after enumerating risks on two other buildings, described the subject matter destroyed by fire, and for which recovery was sought, as follows:

"$3,500 on a two story brick and frame building, used as a Sulphuric Acid Manufactory, about five hundred feet south of the first named building. $3,500 on stock and $225 on machinery, including chemical apparatus contained in *and out* of the factory building *and connected therewith.* HELD:

That the policy covered all stock, machinery and apparatus on the grounds or premises used for the purpose of the manufactory, whether in or outside of the insured building, provided they were connected with the manufacturing of Sulphuric Acid therein, and whether under one shed or another, or one building or another. Actual physical or mechanical connection was not essential either as to the machinery, apparatus or stock, but only a connection in purpose, application and use.

Washington Fire Insurance Company *vs.* Davison and Symington.

APPEAL from the Superior Court of Baltimore City.

The Policy of Insurance on which this suit was brought, was issued on the 16th of June, 1866, by reason of a verbal application made by Davison, one of the appellees, to the appellant. The fire took place on the 27th of January, 1867. A similar insurance was effected in the Maryland Insurance Company by the appellant, for its own convenience, and without the request of the appellees. As first prepared the two policies contained a clause of insurance on $3,500 on stock, and $225 on machinery, including chemical apparatus contained in the factory building. When, on receiving the policies, it was discovered by the appellant, Symington, that they thus only covered stock, machinery, &c. contained in the factory, which was not in accordance with the application made and accepted, he, with his brother, one of the firm, and since deceased, agreed that the phraseology must be altered, and they so procured it to be. The policies were accordingly changed, so as to read "contained in and out of the factory building and connected therewith,"—the words "and out of" and "and connected therewith" being added. This alteration was made on the policy issued by the appellant, in the handwriting of a clerk of the appellant. The appellant proved that this clerk had no authority to contract for insurance, or to modify, in any way, the Company's contracts. But it was in evidence that the policy in the record book of the appellant containing a transcript of the policy was altered by the same clerk, duly, to conform to the alteration in the policy itself, and evidence was further given tending to show that Mr. McGinnis, the appellant's secretary, was cognizant of the alteration, and caused the Maryland Company to alter its policy in the same manner to conform. It was further proven that the premium was not paid to either Company till the alterations were made as stated.

The premises in question comprised, when the insurance was made, a large building or chamber for the manufacture of acid, which is designated as No. 1, and was then complete,

and a second chamber, No. 2, parallel with No. 1, at the distance of about twenty-two feet, and in process of erection. Between the two were a furnace, a still, and other apparatus, more or less near to completion, together with a quantity of sulphur and nitrate of soda, articles used in the manufacture of sulphuric acid.    Two other chambers like Nos. 1 and 2, and to the north of them, were contemplated at the time of insurance.    No. 3, to the north of No. 1, was commenced in November, 1866, and required only a few courses of shingles to be finished when the fire took place.    The secretary of the appellant, with the secretary of the Maryland Company, inspected the premises before the risk was taken.    There was the most direct conflict of testimony as to the condition of the premises when the inspection took place.    Evidence, however, was given by the appellees, tending to prove not only that actual and ample notice was given and explanation made of the mode in which the factory was to be completed and conducted, but that things were in such a condition, when the inspection was made, as to give notice of themselves to any person competent to inspect such an establishment.

On the other hand the denial of all this, on the part of the secretaries of the insurance companies, McGinnis and Milnor, was explicit.    The conflict of testimony was marked, as to a shed erected between Nos. 1 and 2 after the insurance was made.    The appellees gave evidence tending to show, not only that the appellant had direct notice that this shed was contemplated, but that the shed itself was partly begun when the premises were inspected, and further, that such a shed was necessary, proper and usual to cover the machinery between the chambers, and ought to have been known to the inspectors to be so.    The fact of notice, as to the shed, as well as that of its having been begun when the premises were inspected, was denied by the appellant's witnesses.    The fire began on this shed.

Six exceptions were taken at the trial below, by the defendant; five were to rulings upon questions of evidence; the

sixth was to the action of the Court in granting the prayers of the plaintiffs and refusing those of the defendant. They will be found presented with sufficient fulness in the opinion of the Court, where they have been considered in detail. The verdict and judgment being for the plaintiffs, the defendant appealed.

The cause was argued before BARTOL, C. J., NELSON, STEWART, MILLER and ROBINSON, J.

*William F. Frick,* for the appellant:

The term "carpenters" employed in the 17th clause of the policy sued on, was not ambiguous. Not being included in section 2, referring to *trades,* but in section 3, referring to *risks,* it obviously referred not to the carrying on of the *trade* of a carpenter, on the premises, but to the *risk* of carpenters' work and employment thereon.

If ambiguous, the defendant was entitled to explain it by evidence of the *particular* usage and understanding of its office, in reference to the term, as binding on all persons who dealt with the company. 1 *Greenl. on Ev., secs.* 292, 295; *Mills vs. Bank of the U. S.,* 11 *Wheat.,* 438, 439; *Fowler vs. Ohio Ins. Co.,* 7 *Wendell,* 273; *Daniel vs. Hudson River Ins. Co.,* 12 *Cushing,* 429.

If on the true construction of the policy, it was avoided, by the employment of carpenters without notice to the company, in making alterations and additions to insured premises, of such a character as to increase materially the risk of fire, the defendant had a right to go into proof of the character of the additions made to No. 1, and the nature and extent of the carpenters' work thereon, without showing that the fire was actually caused thereby.

The defendant's first prayer presented the true question of fact and law fairly—that the defendant was bound, provided the erection of the shed was contemplated by the plaintiffs, and such intention was known to the defendant at the time

the insurance was effected. Instead of granting this instruction the Court granted the prayers of the plaintiffs, all proceeding upon the theory that it was proper and necessary to cover the apparatus, &c.; that the defendant was bound to know that fact; that it was responsible for the ignorance of its examiners, &c., and that if they found " that the shed would be necessary and proper to cover the apparatus," &c.; that the erection of such shed was no defence, &c.

The error in refusing the defendant's prayer and granting those of the plaintiffs instead, was that the evidence did not justify the putting it to the jury, as the true issue of fact in the case, to find whether the covering of the apparatus by a shed was proper and necessary. The instructions proceeded upon a plain misconstruction of the evidence; and did not present the true point distinctly to the jury.

The defendant's sixth prayer grouped together fully all the facts in the case touching additional sheds and buildings, and after requiring the jury to find that *by reason of such erections*, the risk of fire was materially increased, and all the buildings were consumed, put it to them to say whether "the erection of such additional buildings, *in the manner described by the witnesses*, was *necessary and proper* to the uses of the· buildings insured," &c., this instruction should have been granted, as presenting the true issue of fact in the case, on these points.

The *second* prayer of the defendant raised an entirely different question. It was conceded that there was a violation of two distinct conditions of the policy: 1st. That in the body of the policy requiring written consent to any previous or subsequent insurance of the same property. 2d. That in section IV, requiring endorsed notice *of all changes that may be made in additional insurances.* The instruction was intended to cover *both*—as working together a forfeiture of the rights of the insured under the policy.

To this it was answered, that as the defendant *knew* of the policy in the Maryland office, it was bound to endorse

it, and is *equitably estopped* from setting up the condition broken.

The evidence ought to be clear and unquestionable, that when the defendant issued its policy, it knew that the Maryland Company had issued or would issue one also on the same property, and this defence, if made out, can only avail in a Court of Equity. *Carpenter vs. Prov. Ins. Co.*, 16 *Peters*, 497, 510; *Barrett vs. Union Trust Ins. Co.*, 7 *Cush.*, 181; *Forbes vs. Agawan Ins. Co.*, 9 *Cush.*, 473; *Pinder vs. Mutual Ins. Co.*, 12 *Cush.*, 471; *Conway Tool Co. vs. Hudson River Ins. Co.*, 11 *Cush.*, 267, 268; *Hutchinson vs. West Ins. Co.*, 21 *Missouri*, 102, 103; *Hale vs. Mechanics' Mutual Ins. Co.*, 6 *Gray*, 723; *Simpson vs. Penn Ins. Co.*, 38 *Penn. State Rep.*, 250; *National Fire Ins. Co. vs. Crane*, 16 *Md.*, 260.

Even if it could be used in a Court of Law, it could not apply to the alleged violation of section IV; because it was clear that the defendant *had no knowledge of the alteration in the Maryland policy* by which the subject matter of the insurance was increased: and assuming that the alteration in the Maryland was valid, (which it was,) and that in the Washington was unauthorized, (which it clearly was,) the relations of contribution between the companies, by means of the unnotified alteration, were substantially changed. 1 *Smith's Lead. Cases, Part* II, 790, 791.

The defendant's third prayer ought to have been granted, as there was evidence sufficient to justify the instruction. 1 *Smith's Lead. Cases, Part* II, 791; *Tate vs. Mutual Fire Ins. Co.*, 13 *Gray*, 82; *Baxter vs. Chelsea Mutual Fire Ins. Co.*, 1 *Allen*, 295.

*R. H. Goldsborough* and *S. Teackle Wallis*, for the appellees:

Evidence of an increase of risk was not admissible as offered by the defendant, its counsel admitting he did not propose to show that such increase of risk had produced in whole or in part, the loss of the property insured. *Jolly vs. Balt. Equit.*

*Society,* 1 *H. & G.,* 301; *Allen vs. Mutual Fire Ins. Co.,* 2 *Md.,* 128; 2 *Parsons on Contracts,* 428; *Stebbins vs. Globe Ins. Co.,* 2 *Hall,* 632; *Gates vs. Madison Ins. Co.,* 1 *Selden,* 469; *Howard vs. Kentucky Ins. Co.,* 13 *B. Monroe,* 282.

These authorities apply equally to the first prayer of the appellees and the sixth of the appellant, the first of which rests upon and the other involves the doctrine which is established by the cases cited.

The evidence of Symington, to which the fourth exception was taken, was clearly admissible. The Court admitted it not as a declaration, but as a fact,—a "verbal fact," in the language of the Supreme Court of the United States.

It was admissible even as a declaration to corroborate Davison's statement on the stand, he being impeached by the testimony of the defendant's witnesses. *Cook vs. Curtis,* 6 *H. & J.,* 94; *Packer vs. Gonsalus,* 1 *Serg. & Rawle,* 536; *Henderson vs. Jones,* 10 *Serg. & Rawle,* 322; *Coffin vs. Anderson,* 4 *Blackford,* 398, 399; *Commonwealth vs. Wilson,* 1 *Gray,* 340.

It was clearly admissible, as a fact, to corroborate his recollection, if that was impeached. And as a test of the truth it was as strong evidence as could be given, for it is impossible to furnish more conclusive proof of a man's having been present, at a particular place, on a named occasion, than that on the next day, *ante litem motam,* he mentioned a fact which had taken place, and which it was next to impossible for him to know of if he had not been there. *Phil. and Trenton R. R. vs. Stimpson,* 14 *Peters,* 462; *Darby's Adm'r. vs. Rice,* 2 *Nott & McCord,* 596, 597; *Lightner vs. Wike,* 4 *Serg. & Rawle,* 203, 206, 207; *Beaver vs. Taylor,* 1 *Wallace,* 642.

The fifth exception presents an objection to a question as leading. The objection was too late. When the objection is to the question and not to the answer, a party cannot allow the question to be put and then object to it if the answer does not suit him. Even if the objection be to the evidence, it must be taken when the offer is made, if the ground of objec-

tion is then known or apparent. *Dent vs. Hancock*, 5 *Gill*, 127. But the question was perfectly legitimate and not leading, (in the objectionable sense of the term,) in view of the witness' confessed uncertainty of recollection, or indeed in any aspect. *Lee, &c. vs. Tinges*, 7 *Md.*, 215; *Frisby vs. Parkhurst*, 29 *Md.*, 58; 1 *Redfield's Greenleaf, sec.* 434 to 436.

The plaintiff's second, third, fourth and fifth prayers, all rest on the proposition, that an insurer is bound to a knowledge of the kind of risk he is assuming, when he insures a manufactory of any sort, and is presumed to know all the requisite adjuncts and casualties which attend and belong, in the ordinary course, to the business which he allows to be there conducted; that if he inspects the premises for himself, he has notice of all that an expert ought to know, from such inspection, and is bound by knowledge to that extent, and cannot set up in his defence the ignorance or incapacity of the inspectors he employs, or any failure of notice because of the same. *Jolly vs. Equitable Ins. Co.*, 1 *H. & J.*, 300, 307; *Harper vs. Albany Ins. Co.*, 17 *N. Y.*, 197, 200; *Harper vs. City Ins. Co.*, 1 *Bosworth*, 520, *and* 22 *N. Y.*, 441; *Eddy st. Iron Foundry vs. Farmers' Fire Ins. Co.*, 5 *R. I.*, 426; *Mayor, &c., of New York vs. Hamilton Ins. Co.*, 10 *Bosw.*, 537, 551, 552; *Mayor, &c., of New York vs. Brooklyn Fire Ins. Co.*, 41 *Barbour*, 231, 235, 236; *Michael vs. Mutual Ins. Co.*, 10 *La. An. Rep.*, 737.; 1 *Am. Lead. Cases*, 773, 779; *Clark vs. Manhattan Ins. Co.*, 8 *How.*, 249; *Perry County Ins. Co. vs. Stewart*, 19 *Penn.*, 45.

The second prayer of the appellant was objectionable upon every ground of good faith and common honesty. A sufficient answer to the prayer is, that in the sense of the prayer there was no "original policy," both policies having been altered before either was accepted, or the premium paid on either, so that really the altered policy was, as between the parties, the one only policy negotiated with either company. But the substantial objection to the doctrine of the prayer is its dishonesty. The law treats an insurance company as

equitably estopped from setting up its own *laches* or omission in cases, where, having the policy to prepare, it has failed to endorse on it facts of which it had notice and which it was bound so to endorse. A *fortiori* does that rule apply in this case, where the policy, the non-endorsement of which is set up, was gotten out by the appellant, of its own motion, for its own convenience, without the request of the appellees. 2 *Am. Lead. Cases*, 627, 628; *N. E. Fire & Mar. Ins. Co. vs. Schettler*, 38 *Illinois*, 170; *Peck vs. New London Ins. Co.*, 22 *Conn.*, 584; *Howard Fire Ins. Co. vs. Brawner*, 23 *Pa.*, 56, 57; *Baltimore Fire Ins. Co. vs. Loney*, 20 *Md.*, 36; 1 *Smith's Leading Cases*, 788, 789.

On the third prayer of the appellant, reference was made to the following authorities: *Perkins vs. Washington Ins. Co.*, 4 *Cowen*, 660; *Durar vs. Hudson County Ins. Co.*, 4 *Zabriskie*, 171; *Digest of Fire Insurance Decisions*, 44, secs. 43, 44. And in response to the construction placed on the policy, as announced in the fifth prayer of the appellant, the following authorities were relied on: 1 *Phillips' Insurance*, sec. 124; *The Eddy street Iron Foundry vs. Farmers' Fire Ins. Co.*, 5 *Rhode Island*, 433; *Bigler vs. New York Central Ins. Co.*, 20 *Barb.*, 636; *Moadinger vs. Mechanics' Fire Ins. Co.*, 2 *Hall*, 493.

MILLER, J., delivered the opinion of the Court.

This suit was brought by the appellees to recover for a loss by fire on their Sulphuric Acid Manufactory, stock, machinery and chemical apparatus connected therewith, situated on Fort avenue near Baltimore. In the policy sued on, after risks on two other buildings, the subject matter destroyed and for which recovery is sought is thus described:

" $ 3,500 on a two story brick and frame building used as a Sulphuric Acid Manufactory, about 500 feet south of the first named building; $ 3,500 on stock, and $ 225 on machinery including chemical apparatus contained in *and out of* the factory building *and connected therewith*."

At the trial six exceptions were taken by the defendant, five to rulings upon questions of evidence, and the last to the action of the Court upon the prayers offered on either side. These several rulings are before us for review on this appeal, and will be considered in the order in which the record presents them.

1st. In the absence of any express provision on the subject in a policy against fire, it is settled law that the making of repairs or additions to, or the erection of adjacent buildings whereby there was a material increase of risk by fire, to the property insured, will not prevent a recovery unless the loss was produced in whole or in part by such increase of risk. The defendant's counsel having admitted he did not propose to show that the loss in this case had been occasioned in whole or in part by the alleged increase of risk, the Court was clearly right in rejecting the offer in the first exception, to prove that building No. 3 was erected immediately adjacent to the building insured and that at the time of the fire carpenters were at work finishing its roof, and that the erection of that building was a material increase of risk to the insured property, unless the fact that carpenters were at work upon No. 3 at the time of the fire, was admissible for the purpose of showing there had been a *carpenters' risk* on the insured premises which avoided the policy under the seventeenth condition thereto annexed. This latter position was strongly pressed in argument, but in our judgment the policy will not bear the construction contended for. In the body of the policy it is provided that if the insured premises shall be *used* for the purpose of carrying on *therein* any trade or occupation, or for storing or keeping *therein* any articles, goods or merchandise denominated hazardous, or extra-hazardous or specially hazardous, in the conditions annexed to the policy, it shall be of no force or effect unless the conditions in that respect are complied with. The seventeenth condition provides that certain risks thereafter mentioned being considered hazardous will subject the insured to a higher rate of premium, and those, therefore,

desirous of having the liberty of *using their premises* for such *purposes* must have the same inserted in their policies which otherwise will be void. Then follow three sections or classifications of various articles of merchandise, trades, occupations and buildings used for particular purposes, headed: 1st. Merchandise generally—Hazardous. 2d. Trades—Extra Hazardous; and 3d. Risks—Specially Hazardous: and in the latter is included the term "*carpenters*" in the same enumeration with "barns and stables and contents," "breweries," "camphene and burning fluids." "hay, straw and provender," "lumber," "manufactories," "mills," &c. It is very obvious from the proviso in the policy and the terms of this condition that what is here prohibited by the term "carpenters" is the use of the insured premises for the purpose of carrying on therein the work or business of a carpenter or converting them into a carpenter's shop, just as the use of the premises for the purpose of storing "camphene and burning fluid" is provided against by the use of those words in the same connection. It has no reference or application to the erection by carpenters of an adjacent building on adjacent ground when the insured premises are not used by them as a work-shop for that purpose. To avoid the policy under this condition, the insured premises must themselves be used for the purpose of carrying on the prohibited trade or for the storage of the prohibited articles. The testimony offered was, therefore, inadmissible upon any ground and was correctly rejected.

2d. The offer in the second exception to prove by the defendant's secretary, as an expert in insurance, that the term "carpenters" thus used in this policy was generally understood in the office of the defendant to refer to the employment and work of carpenters in erecting or adding to buildings insured was properly rejected. The policy in this respect is sufficiently plain and will admit only of the construction we have placed upon it. But if the term "carpenters," as here used, could be regarded as in any degree ambiguous so as to admit of parol evidence or usage to explain it, it was not competent

to do so by showing merely what it was generally understood to mean in the office of the defendant, without any proof or proffer of proof that the plaintiffs knew of such understanding. The scope of the inquiry is altogether too narrow. To allow an underwriter to escape responsibility by proof of a general understanding in his own office of the meaning of the terms of his policy would be to transform such contracts, justly denominated contracts *uberrimæ fidei*, into mere traps for the unwary and confiding. The law will never permit the rights of the assured to rest upon any such fluctuating and unsafe basis.

3d. We cannot perceive upon what ground error can be predicated of the refusal by the Court to allow the question set out in the third exception to be asked: Whether it was, or not, an uniform usage of this company, to endorse written permission on all its policies, in case of an alteration of, or addition to insured premises, whereby the risk of fire was materially increased, was a matter wholly immaterial to the case. There was no requirement of the policy to that effect, and the usage, if it existed, was wholly gratuitous, and could not in any manner have affected the insured, even if they knew it.

4th. Davison, one of the plaintiffs, when examined as a witness, swore that he *was present* when McGinnis and Milnor, the secretaries of the two companies, examined the premises previous to taking the risks and pointed out to them the plan of the buildings about to be erected. McGinnis and Milnor, in their examination for the defendant, swore that Davison was *not present* on that occasion. Their testimony, therefore, went to a substantial impeachment of the *credibility* of Davison. The plaintiffs then proved that at the time of the examination, McGinnis did a certain act and made a certain remark in regard to the building, which he had not communicated to Davison. The latter was then recalled and swore to the occurrence and remark. The plaintiffs then proved by Symington, that on the same evening or the next

morning, after the visit of McGinnis and Milnor, being the next time he saw Davison, after the visit the latter mentioned to witness the occurrence in question and the remark made by McGinnis. To this testimony the defendant excepted, but the Court allowed it to go to the jury, and to this ruling the defendant took its fourth exception. We are clearly of opinion the testimony was admissible to corroborate Davison, whose credibility had thus been impeached by the defendant's witnesses. The ruling falls directly within the decision in *Cook vs. Curtis*, 6 *H. & J.*, 93, and the rule of evidence of which that case is an illustration.

5th. By the plain reading of the fifth exception, a question was asked one of the plaintiffs' witnesses, in his examination in chief, which he was allowed to answer, and after it had been answered, the defendant objected to it as a leading question. This objection the Court refused to sustain. The objection came too late. When the objection is to the question and not to the answer, it must be made before the question is answered. The opposing party cannot allow the answer to come in and then if it does not suit him, object to the question. When the objection is to testimony it must be taken when the offer is made, if the ground of objection is known or apparent, and not after it has gone to the jury, and the same rule applies to a case like this. The alleged objection to the question that it was leading, was just as apparent when it was asked, as after it had been answered. It is therefore unnecessary to inquire, whether the objection would have been well founded, or not, if it had been made in due time.

6th. The sixth exception presents for review the prayers, which were offered on either side.

The plaintiffs' first prayer, that the defendant's liability under the policy, (which contains no clause making it void for that reason,) was not affected by any additions to the factory, machinery or apparatus insured, made after the execution of the policy, unless the loss was occasioned in whole

or in part by such additions, merely announces the proposition, which we have already decided in passing upon the first exception and was correctly granted.

One of the main points of controversy relates to the erection of the shed by which the steam boiler and other apparatus connected with the manufacture of sulphuric acid, in the insured building, were covered and protected. There was proof that at the time the secretaries of the two companies visited and examined the premises with a view of taking the risks the insured building was completed, or nearly so, but the business of the manufactory had not then commenced; that at a distance of about twenty-two feet from this building and parallel therewith, the brick foundation for another factory for the same purpose (called in the evidence building No. 2) was laid; that the steam boiler and smoke stack were erected but not covered; and that neither the evaporating pan nor the nitric acid still had been put up, but the brick and stone foundations for both had been laid and completed, and the still itself was lying on the premises. All these fixtures were situated between the insured building and the foundation of No. 2, and nearer to the latter. It is conceded the assured had the right to cover and protect them in some manner, without affecting the validity of the policy. Instead of erecting separate sheds over each, the plaintiffs proceeded to erect and complete No. 2, and then built a shed covering the entire space between the two buildings, and extending their entire length, resting upon timbers placed across from one to the other. The fire originated on this shed, caused, most probably, by the smoke stack of the steam boiler passing through it, or from sparks therefrom.

In view of these facts, and of all the evidence in the case, the plaintiffs presented their second prayer, that even if the jury should find the loss might not have occurred but for the erection of this shed between these buildings, yet if they find the apparatus covered by the shed was appropriate and usual as part of, or connected with a Sulphuric Acid Manufactory

like that mentioned in the policy, and was properly located for the uses and purposes thereof, and that said shed was a *proper and usual* protection to such apparatus, and that the defendant's secretary examined the premises with a view to their insurance, and found said apparatus, or the buildings, or foundations therefor, constructed in whole or in part, and as yet exposed and unprotected, then the subsequent erection of said shed over said apparatus is no bar to their right to recover.   In our judgment there was evidence in the case from which the jury, if they believed it, might have found that the particular shed in question was a proper, usual and necessary protection for the machinery and apparatus so situated, as well as all other matters of fact submitted to their finding by this prayer.   This being so, the legal proposition involved in the prayer cannot be seriously controverted.   On the other hand there was evidence from which the jury might have found the contrary, that is, that the erection of this shed, in the manner in which it was constructed, was not a usual, proper or necessary protection of the machinery and apparatus, and if they so found, and that the risk of fire was materially increased thereby, and that the loss complained of was caused by such increase of risk, then the plaintiffs were not entitled to recover, unless they further found the defendant knew, at the time the insurance was effected, that the plaintiffs intended to erect the shed in the manner in which it was subsequently erected.   If a prayer on the part of the defendant had been offered plainly and distinctly, presenting this counter-proposition, it would have been error to refuse it.   But no such instruction was asked.   The defendant's first prayer, which approaches the position most nearly, is defective mainly for assuming and embodying as an element of increased risk, the erection under the shed of a furnace for the manufacture of *nitric acid,* as if this was an independent manufacture, disconnected from the purposes and necessities of a manufactory of sulphuric acid, whereas it was proven, without contradiction, that the use of nitric acid in

the manner described by the witnesses was the most usual and best method of manufacturing sulphuric acid; and, moreover, the foundation for the nitric acid still, for the purpose of such manufactory, was laid at the time the defendant's secretary inspected the premises. This prayer was therefore correctly rejected, because of its misleading tendency in this particular, no matter how correct it might have been in other respects.

The third, fourth and fifth prayers of the plaintiffs, as well as the second, rest upon the propositions that an insurer taking a risk like the present upon a sulphuric acid manufactory and machinery and chemical apparatus connected therewith, is presumed to know and to have contemplated all the casualties and incidents to which the subject insured might be liable as such manufactory, and to have known all the requisites and adjuncts belonging thereto; and if he inspects the premises by himself or his agents, he has notice of all an expert ought to know from such inspection, and is bound by knowledge to that extent, and cannot set up in defence the ignorance or incapacity of the inspectors he employs. These propositions are founded in justice and sound reason, and are abundantly supported by the authorities cited in that behalf by the appellees' counsel in argument.

The second prayer of the defendant combines two distinct reasons for avoiding the policy sued on. 1st. The non-endorsement thereon in writing of another insurance in the Maryland Fire Insurance Company, within the proviso in the body of the policy itself. And 2d, the non-endorsement of a *change* in this latter policy by the addition of the words " *and out of* " and " *and connected therewith,*" within the fourth condition annexed to the policy in suit. The second ground of objection is without foundation in fact. It is admitted the policy in the Maryland office contains the same provisions as that in suit, and the eighth condition provides it shall not be considered as binding until actual payment of the premium. It is also established by undisputed evidence, that this alteration in the Maryland policy was made by the secretary of that

company (whose act in so doing is admitted to be effective to bind the company) before the premium was paid. Thus at the time this policy became a binding and effective contract between the parties, and when the risk was first incurred thereunder, it was in the. form in which it now stands, and consequently there was no *change* to be endorsed on the policy in suit within the terms of its fourth condition. The correctness of the *first* branch of this prayer depends first upon the question whether the policy in the Maryland office procured at the time and under the circumstances stated in the evidence comes within the terms of the proviso referred to. It is proved the plaintiffs did not apply to the Maryland Company for insurance, but sought their whole insurance from the defendant, and the latter for its own convenience and not at the request or authority of the plaintiffs, applied to the Maryland Company to share the risk; that the premises were examined by the secretaries of the two companies together, with a view of taking the risk conjointly: that both policies as originally drawn were precisely similar, of the same date, for the same amount, and both were altered in the same particulars before the premiums were paid; and that the premiums were paid to both companies on the same day. It thus appears the Maryland policy was effected with full knowledge on the part of the defendant, indeed at its request and for its convenience, that both policies were precisely similar and became effective and binding contracts at the same time. The proviso is that "if any other insurance *has been* or shall *hereafter* be made on the said property," without the consent of the company in writing endorsed thereon, the policy shall be void. The design of such provisions respecting notice of prior and subsequent policies, is to enable underwriters to judge whether they ought to insure at all and at what premium, and to ascertain whether there still remains any such substantial interest of the assured in the premises insured, as will guarantee on his part, vigilance, care and strenuous exertions, to preserve the property. Underwriters do not

rely so much upon the principles, as upon the interest of the assured. Whether there be any other insurance or not on the property, is a fact material to them, and perfectly known to the assured and not easily or ordinarily within the means of knowledge of the insurers; hence, the importance and necessity of such clauses. *Carpenter vs. The Providence Washington Ins. Co.*, 16 *Peters*, 510. Whilst it may be said the public have an interest in maintaining the validity of these clauses, and giving them full effect and operation, inasmuch as they have a tendency to keep premiums down to the lowest rates, and to uphold *institutions of this sort, so essential to* the protection of property; yet, like every other stipulation in the policy, they must receive only a fair and reasonable interpretation according to their terms and obvious import. We are satisfied no rule of construction is violated, and no just end of public policy subverted or endangered by holding that this policy in the Maryland office, obtained with the knowledge and under the circumstances stated, was neither *prior* nor *subsequent* to the policy sued on, but took effect contemporaneously and *uno flatu* with it, and is not within either the spirit or the letter of the clause in question. Placing this construction upon the clause, it would be improper to express any opinion upon the other interesting and important question, so ably argued at bar, on this branch of the case.

The defendant's third prayer assumes that the alteration in the policy was made after it was *issued* and delivered to the plaintiffs, but the proof is clear it was made and required to be made before the premium was paid, and by consequence before by its own terms it became a valid and binding instrument. It was never *issued* in the legal sense of the term, and no risk was taken until after the alteration was made. Again this prayer asserts, that if the clerk who made the alteration had no authority to do so, and thereby bind the company, and that the same was not known to the president or secretary of the defendant until after the fire, then the

words introduced by the alteration form no part of the policy. This assumes that nothing but actual notice of the alteration would bind the company, and ignores altogether the fact that the same alteration was made at the time, by the same clerk, in the record of the policy in the record book, in which all policies issued by the company were recorded. In our opinion constructive notice is imputed to the company from this record in their own books, kept by them for the sole purpose of recording their policies, and that they were bound by this as effectually as by actual notice.

By the true construction of the policy as it stands, assuming the alterations to have been properly made, and to form part of it, it covers all stock, machinery and apparatus on the grounds or premises, used for the purpose of the manufactory, whether in or outside of the insured building, provided they were connected with the manufacturing of sulphuric acid therein, and whether under one shed or another, or one building or another. Actual physical or mechanical connection was not essential either as to the machinery, apparatus or stock, but only a connection in purpose, application and use. There was consequently no error in the rejection of the defendant's fourth and fifth prayers.

The sixth prayer is erroneous for the reason already stated, in asserting that the erection of buildings Nos. 2, 3, &c., if found to increase the risk, will avoid the policy, even though the loss may not have resulted from such increased risk.

Having thus considered, in detail, the several rulings excepted to, and finding no error in any of them, the judgment must be affirmed.

*Judgment affirmed.*

(Decided 21st January, 1869.)