## HUGH. McALEER vs. OUTERBRIDGE HORSEY.

*Fraudulent Representations — Avoidance of a Contract on the ground of Fraud — Pleadings in an action on the case for Deceit—Averment of damage — Variance — Waiver—Corroborative Evidence —Construction of Act of 1864, ch. 109, allowing Parties to testify.*

In order to avoid a contract on the ground of fraud, the fraud must be material to the contract.

Fraud is material to a contract when the contract would not have been made if the fraud had not been practised.

Whether fraud be material or otherwise is a question for the jury under the instructions of the Court.

In order to constitute a good cause of action, the fraud must work an actual injury to the plaintiff, and it must appear that he had a right to rely upon the fraudulent statement, and that he did mainly rely upon it, even though in part influenced by other causes.

M falsely represented to H that shares in certain silver mines were a profitable investment, and in reply to queries, falsely asserted that he himself had invested a large amount in the shares and working capital of the said mines, not in stock or land at a valuation, but in actual money; whereupon H, at the solicitation of M, and relying solely upon his representations, purchased the shares, which proved to be in fact valueless. HELD:

1st. That such a fraud is actionable at common law.

2d. That the exception in the law of fraudulent representations, as to the value of real estate, has no application in this case.

3d. That even if M, at the time he made the misrepresentations, believed the mines to be worth the sum stated by him, this does not excuse the fraud.

4th. That the real value of the property was of no importance in the case, except in relation to the question of damages.

5th. That the fact that H continued to act as a shareholder after discovering the fraud was no waiver of his right of action.

A count in a declaration, after setting out false and fraudulent representations, concluded: "And the plaintiff says that by means of said false and fraudulent representations, the defendant obtained from the plaintiff the sum of $2,000, and the plaintiff is entitled to recover the same from the defendant." HELD:

That this was a sufficient averment of damage.

A declaration averred that by means of alleged false and fraudulent representations, the plaintiff, after the making of the same, and before action brought, was induced to purchase two shares in certain mines for the sum of $2,000, whereby he was defrauded, and concluded: "And the plaintiff claims $5,000." HELD:

1st. That in support of the contract of sale thus set out in the declaration, proof might be offered of the sale of one share, or of two shares, at the same time, or at different times, before suit brought.

2d. That the plaintiff might recover to the extent of damage proved to have been sustained as the direct consequence of the fraud.

Where fraud is the gist of an action, fraudulent conduct of the defendant of a similar character, at or about the same time, towards third parties is admissible to show the *animus* of the particular transaction, and may be proved by third parties or by the cross-examination of the defendant himself.

In an action for fraudulent representations, the plaintiff testified that the defendant made to him at a certain interview the representations alleged in the declaration, which the defendant at his examination denied. The plaintiff then offered to prove by A that immediately after the said interview he met A, and, out of the presence of the defendant, gave him an account of the statements made by the defendant, which was in all respects similar to that testified to by himself. When this evidence was offered, the defendant's counsel, disclaiming all purpose of impeaching the integrity of the plaintiff in his version of the defendant's representations, objected to its admission. Upon appeal from the order overruling the objection, HELD:

1st. That if the question were as to the plaintiff's *understanding* of the representations, the disclaimer by the defendant's counsel rendered the admission of A's testimony harmless.

2d. That if the question were as to the *fact* of the representations, the testimony of the defendant amounted to a substantial impeachment of the credibility of the plaintiff, which could not be avoided by the disclaimer, and which allowed the admission of A's testimony as corroborative.

3d. That the rule admitting corroborative testimony applies where the impeached witness is a party to the suit.

APPEAL from the Circuit Court for Washington County.

This action was brought by the appellee in the Circuit Court for Frederick county, to recover from the appellant in damages the sum of $2,000, alleged to have been obtained by false and fraudulent representations made by the appellant, to induce the appellee to take stock in certain Nevada silver mines. The cause was removed by the appellant to Washington county, where it was tried and a verdict for the full amount claimed, with interest, was rendered in favor of the appellee. The form of action was *case for deceit.*

The case is stated in the opinion of the Court.

Three exceptions were taken in the Circuit Court by the defendant. The first is omitted as it was virtually abandoned in this Court.

*Second Exception.*—After the evidence and ruling in the preceding exception, made a part hereof, the plaintiff having given evidence in chief by himself as a witness, to show that the defendant had made to him the representations set forth in the declaration, and the defendant having testified as a witness in the cause to the effect that he did not, in the interview spoken of, make the statements so testified to by the plaintiff, the plaintiff then offered to prove by Samuel Ahalt, (the witness who had gone with him near to the office of the defendant, where the interview between the plaintiff and the defendant took place, said witness having been previously requested by defendant to procure plaintiff to take an interest in the mines mentioned in the declaration, and had gone with the plaintiff to Frederick, where plaintiff went to see defendant on that subject,) that immediately after the interview aforesaid, the plaintiff met the witness, Ahalt, and being out of the presence and hearing of the defendant, gave to said Ahalt an account of the statements made by the defendant at said interview, which were in all respects similar to those tes-

tified to in chief by the plaintiff—the witness giving in detail what the plaintiff told him had occurred in that interview as to the defendant's representations—and thereupon the defendant's counsel disclaiming, at the time of the plaintiff's offer, and not before, all purpose of impeaching the integrity of the plaintiff in his understanding or version of the defendant's representations as testified to by him, objected to said offered testimony, but the Court overruled the objection and allowed the evidence to be given to corroborate the testimony of the plaintiff so given in chief, and thereupon the defendant excepted.

*Third Exception:* The plaintiff prayed the Court to instruct the jury as follows:

1. That if they believe that the defendant, in making sale to the plaintiff of the shares or interest in the silver mines in the declaration mentioned, represented to him that he had paid $25,000 in money, and not in stock or lands, at a valuation for one-fourth interest in the silver mines in the declaration mentioned, with interest, to induce the plaintiff to purchase such shares or interest, and if the jury find that such statement was falsely and knowingly made by the defendant, and that the plaintiff acted thereon and purchased such shares and paid for them, the plaintiff is entitled to recover for such false representation, although they should find that the defendant was not in fact benefitted by such sale and representation, or did not expect to be.

2. That if they find that the defendant falsely represented to the plaintiff, with knowledge at the time of the falsity of such representation, that he had paid $25,000 in cash money for an undivided fourth interest in the mines mentioned in the declaration, with intent to induce him, the plaintiff, to purchase an interest therein, and that the plaintiff believing such representation to be true, was actually induced by such false representation to purchase two interests or shares therein, the whole in one hundred shares or parts to be divided, and pay to the plaintiff therefor the sum of $2,000, the plain-

tiff is entitled to recover in this action such amount as the jury may find the plaintiff has lost, by the direct consequence of such false representation, if he in fact has sustained any such loss; not to exceed, however, the amount paid for said two shares, with interest thereon.

3. If the jury find that the defendant, McAleer, represented to the plaintiff, Horsey, that he, McAleer, was the owner of the one-fourth interest in the silver mines mentioned in the declaration, and that he had paid the sum of $25,000 therefor in money alone, and not in money and stocks, or lands, or anything at a valuation, and which latter representation was false to the knowledge of said McAleer at the time, and that McAleer meant by such representation to induce Horsey also to become the purchaser of an interest in the said mines, and that Horsey, relying on such representation, and believing it to be true, did act upon it, and as a consequence thereof, agreed to purchase an interest in the mines, and paid the defendant, McAleer, the sum of $2,000 for an interest; and if the jury further find that McAleer did not pay the sum of $25,000 in money for one-fourth interest in the mines, but acquired that interest by the payment of money and the transfer of lands at a valuation; and also find that by reason of such false representation Horsey has suffered damage, then the plaintiff is entitled to recover such loss as may have been the direct result of such false representation, not exceeding in amount the sum so as aforesaid paid, with interest; and it is no defence to the plaintiff's right to recover, that the defendant was not benefitted or expected to be benefitted by such false representation.

The plaintiff's fourth prayer was omitted from the record, and was, therefore, not passed upon by the Court.

The following were the prayers of the defendant:

1. That even if the jury find from the evidence in this cause, that the subscriptions of the plaintiff for the shares taken by him in the silver mines mentioned in the declaration were obtained from the plaintiff by a misrepresentation

of the price and manner in which the defendant had paid for one-fourth interest in said mines, the plaintiff is not entitled to recover in this form of action, provided they find that the defendant believed, at the time of such misrepresentation, that said mines were worth $100,000, the price at which they were valued in the sale thereof, and that the defendant did not intend to injure the plaintiff or defraud him out of his money.

2. That even if the jury find from the evidence in this cause, that the subscriptions of the plaintiff for the shares taken by him in the silver mines mentioned in the declaration, were obtained from the plaintiff by a misrepresentation of the price and manner in which the defendant had paid for one-fourth interest in said mines, the plaintiff is not entitled to recover in this form of action, provided they find that the defendant believed, at the time of such misrepresentation, that said mines were of substantial value, and that the defendant did not intend to injure the plaintiff or defraud him out of his money.

3. That no misrepresentation by the defendant of the price which he had paid for his own interest in said mines, furnishes of itself a sufficient cause of action entitling the plaintiff to recover in this suit.

4. If the jury believe that in the interview between the defendant and plaintiff, at which the plaintiff agreed to subscribe for a share in said mines, the defendant did not mean nor intend to represent to the plaintiff that he had paid in actual money the sum of $25,000 for one-fourth interest in said mines, then, under the pleadings in this cause, the plaintiff cannot recover, because such finding negatives the fraudulent intent charged in said declaration, even although the plaintiff may have so understood him.

5. That fraud is odious in contemplation of law, and not to be presumed, and the burthen of proof is on the plaintiff to overcome such legal presumption by evidence satisfactory to the jury.

6. That it is for the jury to determine, under all the evidence in the cause, whether the representations made by the defendant to the plaintiff were misrepresentations of facts material to the real value of the property, and unless the jury find that they were of facts material to such value, the plaintiff cannot recover by reason of said representations having been made.

7. That the plaintiff is not entitled to recover in this case, unless the jury find from the evidence that the defendant procured the money of the plaintiff upon his said subscriptions by means of the representations charged in the declaration or some count thereof; and further, that said representations were false in fact, and were made fraudulently and deceitfully, and with an intent that the plaintiff should act thereon, believing the same to be true, and that the plaintiff did act thereon and was injured thereby.

8. That the representations and statements made by the defendant to witness in this cause, other than the plaintiff, are not evidence to be considered by the jury for the purpose of proving what representations were made by the defendant to the plaintiff, or for the purpose of shewing the falsehood of the representations made by him to the plaintiff, and the jury are only at liberty to consider the representations and statements made by the defendant to said witnesses, for the purpose of ascertaining the intent of the defendant in any representations he may have made to the plaintiff.

9. If the jury believe from the evidence that the shares sold by the defendant to the plaintiff, were not shares belonging to all the owners of said mines, but were shares belonging exclusively to Elmore and Smeltzer, in which the defendant had no interest as joint owner, then the plaintiff cannot recover, because of a variance between the ownership of said shares, as stated in said declaration and as found by the jury.

10. If the jury find from the evidence that the shares in said silver mines, purchased by the plaintiff from the defendant, were in fact sold to him on two several occasions, and

not under one entire contract or agreement, then the plaintiff cannot recover, because of a variance between the contract of sale, as stated in the declaration, and that so found by the jury.

11. That if the jury should find for the plaintiff under the instructions in this cause, the measure of damages is the difference between the price paid for shares in said mines and the actual value of them, as measured by the actual value of the said property.

12. If the jury find, that at the date of the representations made to the several witnesses who have testified in behalf of the plaintiff, the defendant had become the purchaser of interests in said three silver mines on certain terms and agreements made between him and Elmore, then it was not obligatory on the defendant to disclose to said witnesses all the terms of said purchase, and no inference of fraud in this case can be based on his omission to disclose all of said terms.

13. That it is not competent for the jury to find fraud in the defendant under the issues joined in this cause, from any evidence tending to show misconduct or misrepresentations by the defendant touching the purchase of other mines, or the disbursements of moneys in his hands; provided, the jury shall find that such misconduct and misrepresentations occurred after the payment of the money subscribed by the plaintiff as shareholder aforesaid.

14. If the jury further find that the alleged misrepresentations and fraud of the defendant, complained of in the declaration, were known to the plaintiff sometime during the summer of the year 1867, and that after such knowledge he continued to act as shareholder in the association of shareholders, and did in April, of the year 1868, propose to associate, and did associate the defendant with him as one of an executive committee in the management of said three mines, and during all said time represented himself and acted as such shareholder, and in and after April, 1868, acted with the defendant as his associate in said executive committee, and

made no claim against said defendant for or by reason of his said misrepresentations and fraud, then such conduct of the plaintiff is a waiver of his right to institute this action.

15. If the jury find from the evidence that the defendant made certain representations different from those charged in the declaration in the interview with the plaintiff, and did not make those charged in the declaration, the plaintiff is not entitled to recover, although the jury should find that the plaintiff understood him to make the representations as laid.

16. If the jury find that in the year 1867 the plaintiff was informed that the defendant had paid for his interest in one-fourth of said mines by transferring, in part payment for said fourth part, his interest in lands in Warren county, Pennsylvania, and that after such information and discovery the plaintiff made no complaint to or claim against said defendant by reason of such discovery, and continued to coöperate with said defendant in reference to the property in said mines after such discovery as before, then it is competent for the jury to consider such conduct of the plaintiff in connection with the interview between the plaintiff and defendant, with a view to determine what representations were in fact made by the defendant at such interview.

The Court granted the second, third and fourth prayers of the plaintiff, and rejected his first; and granted the fifth, seventh, eighth, eleventh, fifteenth and sixteenth prayers of the defendant, and rejected his first, second, third, fourth, sixth, ninth, tenth, twelfth, thirteenth and fourteenth prayers.

The defendant excepted to the action of the Court in rejecting his first, second, third, fourth, sixth, ninth, tenth, twelfth, thirteenth and fourteenth prayers and in granting the second, third and fourth prayers of the plaintiff. The verdict and judgment were for the plaintiff and the defendant appealed.

The cause was argued before BARTOL, C. J., STEWART, BRENT, GRASON and MILLER, J.

*George Schley* and *William M. Merrick* for the appellant.

*On the second exception.*—The point is whether it was competent to support the plaintiff's version of the defendant's statement, at the interview between them, which resulted in the purchase of his shares, by proving similar *ex parte* statements, made by the plaintiff to a witness, just after the interview, when the plaintiff's veracity had been no otherwise impeached than by the contradiction of the defendant, as to the version of his remarks, given by the plaintiff, and this, when the defendant, by his counsel, expressly disclaimed all impeachment of the integrity of the witness? That such evidence would not be received in other Courts is abundantly shown by 1 *Greenleaf's Evidence,* 469 *and notes; U. States vs. Holmes,* 1 *Clifford,* 98; *Conrad vs. Griffey,* 11 *How.,* 480.

But the Court below held itself bound to admit this testimony, by reason of the binding force of *Cook vs. Curtis,* 6 *H. & J.,* 93, *and Wash. Ins. Co. vs. Davision,* 30 *Md.,* 104.

In both of these cases the witness, had *sworn* he was *present on a certain occasion* and heard certain statements, and he had been necessarily impeached by proof, that he was *not present,* and, therefore, as his veracity had been drawn in question, he was corroborated by proof of his prior *ex parte* statements, and this is the ground on which the exceptional cases are put by the Court in 30 *Md.,* 104.

In this case there was no denial that the plaintiff was present on the occasion, but the *contradiction* was simply as to his understanding of what was said, which contradiction clearly would not entitle the plaintiff to support his character for truth. *Vernon vs. Tucker,* 30 *Md.,* 462; *Rex vs. Parker,* 2 *Doug.,* 242; 3 *Cowen,* 621; 36 *Maine,* 297; 4 *Yerger,* 215; 24 *Pick.,* 245; 1 *Starkie,* 47; *Miller vs. State,* 8 *Gill,* 143.

*On the question of waiver.*— The appellee is estopped by every principle of good faith from ripping up alleged frauds which he had known of long ago, and not only slept on but knowingly waived. 1 *Greenleaf's Evidence,* secs. 207, 208; 10 *Pick.,* 275; 5 *Leigh,* 391, 643; 10 *Leigh,* 431; 11 *Leigh,*

349–351, 352;  6 *Ad. & Ellis*, 472, 474;  6 *Johns. Ch. R.*, 166 ; 2 *Story's Eq.*, secs. 385. 390, 391 ; 19 *Johns.*, 473.

If the appellee knowingly affirmed the contract and took the chances of success he cannot now recover.   30 *Law Journal*, (*N. S.*,) 4 ; 1 *Ad. & Ellis*, 40, 41.

*S. Teackle Wallis* and *Attorney General Syester*, for the appellee.

The point raised by the second exception is believed to be clearly covered by the decisions of this Court.   But although, in the cases from 6 *H. & J.*, 93, and 30 *Md.*, 104, the previous declarations were admitted, on the theory that the credibility of the witness who made them had been impeached, the principle established by the old cases cited and recognized in 6 *H. & J.*, 94, is not limited to that single state of facts.   The previous declarations are allowed to be proven, " not as direct evidence, yet it may be in corroboration of a witness' testimony, to show that he affirmed the same thing before, on other occasions, and that the witness is still constant to himself."   They may be introduced to confirm, just as they may be to invalidate, the testimony.   *Gilbert's Law of Evid.*, 135 ; *Bacon's Abridgmt.*, 213, *Evid. K.*; *Buller's N. P.*, 294; 2 *Hawk. Pl. C.*, 607, (1st *Ed.*, 431);   *Com. vs. Bosworth*, 22 *Pick.*, 397 ; *Henderson vs. Jones*, 10 *S. & R.*, 322 ; *Coffin vs. Anderson*, 4 *Blackf.*, 398, 399 ; *Conrad vs. Griffey*, 11 *Howard*, 480.

*A fortiori* is this doctrine reasonable in a case where impeachment of integrity is disclaimed, and it can therefore, on the theory of the appellant, be only a question of intelligence and memory.

This evidence was admissible, if on no other ground, as part of the *res gestæ*.

The real value of the property is not involved in this controversy, except in its relation to the questions of injury and damages.   It has nothing to do with the misrepresentations charged.   The materiality of these to the purchase is alone in

question, not their materiality to the value of the thing purchased. *Smith vs. Countryman*, 30 *N. Y.*, 669 ; 2 *Parsons on Contracts*, 769, 770 ; *Ross vs. Estates Inv. Co.*, 3 *Eq. Cases*, (*L. R.*,) 136 ; *Moens vs. Heyworth*, 10 *M. & W.*, 157 ; *Pendergast vs. Reed*, 29 *Md.*, 398 ; *Addison on Contracts*, 907 : *Henderson vs. Lacon*, 5 *Equity*, (*L. R.*,) 257–260.

The tenth prayer of the appellant asserts that if the shares fraudulently sold to Horsey were sold to him on two several occasions, and not under one entire contract or agreement, there is a variance between the averments and the proof, and there can be no recovery.

If the action were in contract, the variance alleged, if it existed, would not be fatal. Surely, an action of warranty upon a contract of sale of two undivided shares, could be sustained by proof of a contract of sale of one, and the defendant could not complain of such a variance, which would be in a matter affecting only the amount of damages (in his favor) and not the substance of the issue or the right of action. 1 *Greenleaf's Evid.*, sec. 61.

But this is an action of *tort*, and variance as to time and quantity is especially immaterial. 1 *Greenleaf's Evid.*, sec. 63 ; 1 *Sharswood's Starkie*, 569, 570.

The appellant's fourteenth prayer was properly rejected.

The action here is not in *assumpsit*, to recover back purchase money paid on a fraudulent and rescinded contract of sale, and where plaintiff, in order to repudiate the transaction, must give up, or offer to give up, the benefits he derived under it, as soon as he learns of the fraud. This is an action of damages for deceit, and involves the continuance of title in the party defrauded, with the right to damages for the fraud which induced him to purchase to his injury. *Kerr on Fraud and Mistake*, (*Am. Ed.*,) 330.

MILLER, J., delivered the opinion of the Court.

This is an action to recover damages alleged to have been sustained by the plaintiff by means of false and fraudulent

representations made to him by the defendant, by which he was induced to purchase shares in certain silver mines in the State of Nevada, and was thereby cheated and defrauded. The record presents many questions which this appeal makes it our duty to decide. We shall consider first those relating to the law of the case raised by the pleadings and the prayers, and then the two exceptions to the rulings admitting certain testimony offered by the plaintiff.

The defendant filed a demurrer to the several counts of the declaration which was overruled, and this raises the question whether each count states a good and sufficient cause of action. Actions of this kind have not often been brought in this State, and we have for our guidance no express decisions of this Court on several of the points now to be determined. The legal principles that must control our judgment have however been well settled by the highest authority elsewhere, and we shall state them as briefly as we can before noticing the particular averments in the three counts of this *nar.*

On some points the decisions have not been altogether uniform, but it may be safely stated they agree on certain general propositions. It is admitted, or rather conceded, as matter of necessity, that neither the common law nor any code of human law seeks to enforce the rule of perfect morality declared by divine authority, which acknowledges as its one principle the duty of doing to others as we would that others should do to us, and which, by consequence, absolutely excludes and prohibits all cunning and craft or astuteness practised by any one for his own exclusive benefit. And it thence follows that a certain amount of selfish cunning passes unrecognized by Courts of justice, and that a man may procure to himself, in his dealings with others, some advantages to which he has no moral right, but to which he may succeed in establishing a perfect legal title. But if any one carries this too far: if by craft and selfish contrivance he inflicts an injury upon his neighbor and acquires a benefit to himself beyond

a certain point, the law steps in, annuls all that he has done, or rectifies the wrong by sustaining an action for the deceit. The practical question then is, where is this point? and to this no specific answer is afforded. The common law not only gives no definition of fraud, but perhaps wisely asserts as a principle that there shall be no definition of it, for, as it is the very nature and essence of fraud to elude all laws in fact, without appearing to break them in form, a technical definition of fraud, making everything come within the scope of its words before the law could deal with it as such, would be in effect telling to the crafty precisely how to avoid the grasp of the law. Whenever, therefore, any Court has before it a case in which one has injured another directly or indirectly by falsehood or artifice, it is for the Court to determine in that case whether what was done amounts to cognizable fraud. Still, this important question is not left to the arbitrary or accidental decision of each Court in each case, for all Courts are governed, or at least directed by certain precedents and rules, among which it is sufficient to state at present, that the fraud must be material to the contract or transaction which is to be avoided, for if it relate to another matter or to this only in a trivial and unimportant way, it affords no ground for the action of the Court. It must, therefore, relate distinctly and directly to this contract and affect its very essence and substance. But there is no positive standard by which to determine whether the fraud be thus material or not. No better rule can be given for deciding the question than this—if the fraud be such that, had it not been practised, the contract could not have been made or the transaction completed, then it is material to it, but if it be shown or made probable that the same thing would have been done in the same way if the fraud had not been practised, it cannot be deemed material. Whether the fraud be material or otherwise seems to be, on the decided weight of authority, a question for the jury and not a question of law, but it is obvious, that in many cases the jury cannot answer this question without instructions

from the Court. Again, the fraud must work an actual injury to the party complaining, and it must appear that he not only did in fact rely upon the fraudulent statement, but had a right to rely upon it in the full belief of its truth, for otherwise, it was his own folly or fault, and he cannot ask of the law to relieve him from the consequences. If, however, the plaintiff mainly and substantially relied upon the fraudulent representation, he will have his action for damages, though he was in part influenced by other causes. These are, in substance, the well-considered views and careful deductions from the authorities held and stated by PARSONS in his work on Contracts. 2 *Parsons' Cont.*, 767 to 773. The same thing is stated substantially and more concisely in *Kerr on Fraud and Mistake*, 73 to 75. The doctrine is also announced by all the text-writers, as derived from the leading case of *Pasley vs. Freeman*, that fraud, accompanied with damage, is a good cause of action. That case, says Chancellor KENT, though it has met with powerful resistance, has been repeatedly recognized, and the doctrine of it is now well settled both in the English and American jurisprudence. 2 *Kent's Com.*, (11*th Ed.*,) 651. The cases in the English Courts on this subject are carefully reviewed in *Benjamin on Sales*, 338 to 345, where it is stated that the settled law of England now is, that to support an action for false representation, the representation must not only have been false in fact, but also have been made fraudulently. In *Addison on Torts*, 827 to 829, the principles are well stated thus: "An action cannot be supported for telling a bare, naked lie, *i. e.*, saying a thing which is false, knowing or not knowing it to be so, and without any design to impose upon or cheat another, and without any intention that another should rely upon the false statement and act upon it; but if a falsehood be knowingly told, with an intention that another should believe it to be true and act upon it, and that person does act upon it and thereby suffers damage, the party telling the falsehood is responsible in damages in an action for deceit, there being a conjunction

of wrong and loss entitling the injured person to compensation. If a defendant has made a false representation, knowing it to be false, with intent to induce, and has thereby induced the plaintiff to enter into a contract into which, but for that representation, he would not have entered, and the plaintiff has been damnified by the falsehood, a case of fraud is made out and an action for damages is maintainable; and whether the defendant has any interest in the assertion he makes, or in the matter respecting which it is made, is perfectly immaterial."

Applying these well settled principles to the case before us as we are now considering it on *demurrer* to the declaration, there is no room for debate so far at least as the first and third counts of the *nar.* are concerned. They charge in substance that the defendant professed and claimed he and two other parties were the owners or shareholders of certain silver mines in Nevada, for an undivided fourth of which he alleged and represented he had paid $25,000 in actual cash, and was desirous of selling parts or shares thereof to the public; that so professing and representing he solicited the plaintiff to purchase shares as a good and profitable investment and speculation, that the latter, having no personal knowledge of the facts so represented, but having unlimited confidence in the integrity, truthfulness and business capacity of the defendant whom he had long known, and being willing to make the investment if the defendant had in fact so paid his $25,000 in money, he personally asked and inquired of the defendant if he had paid $25,000, not in property or stock valued, but in actual cost for this one-fourth, and stated to him he would purchase an interest if such was the fact, as he had great confidence in his business sagacity, and would regard such an investment by the defendant as conclusive evidence of his approval and confidence in the speculation as a safe and profitable one; that he then told the defendant he made this inquiry expressly for the purpose of determining whether he would or would not purchase, and that he would

rely on and be governed altogether by the defendant's answer to this inquiry, and would purchase if the defendant stated he had in fact made such payment of $25,000 in money as contradistinguished from stock, lands or any other thing at a valuation, and would not purchase unless the defendant so stated, and that he requested the defendant to answer frankly, as he would be governed absolutely by such answer; that the defendant thereupon did reply and represent to the plaintiff that such investment was a good and profitable one to make, and that he had in fact paid $25,000 for one-fourth of these mines, not in stock or land or any other thing at a valuation, but in good faith in actual money, and had moreover paid $10,000 in actual money besides as working capital for said mines, whereupon the plaintiff relying and confiding altogether and exclusively upon the faith and truth of these statements and not upon any other cause or inducement whatever as the defendant well knew, did purchase two undivided one-hundreth parts or shares of these mines as and for a safe and profitable investment, and paid to the defendant therefor the sum of $2,000; that these statements and representations as to his having paid the $25,000 in money for the one-fourth, and as to his having paid $10,000 besides for working capital for the mines were, and each of them was, false, fraudulent and deceitful, and so well known to be by the defendant when he made them, and that the same were made with intent to cheat and defraud the plaintiff, and by means of such fraud and deceit to induce and procure him to believe that these mines were worth $100,000, and to purchase an undivided interest therein at that rate, and that the defendant by means of these false, fraudulent and deceitful representations, wrongfully induced the plaintiff to become, and he did by reason thereof become, the purchaser of shares and paid his money as before stated, and as and for a safe and profitable investment as aforesaid, whereas the said alleged mines were in fact valueless as the defendant well knew.

The demurrer admits the truth of all these averments, and that leaves no question open for discussion.   The representations are thus by the parties themselves made the material and determining ground of the contract, and without them it never would have been entered into; the plaintiff acted solely and exclusively upon their faith and credit, and they therefore went to the very substance and essence of the transaction; he was deceived by them and has suffered loss in consequence; the defendant knew them to be false when he made them, and though approached in confidence and put upon his honor to tell the truth in frankness, he made these false statements with the fraudulent intent that the plaintiff should, as he did, act upon them, and by this means he took money from his neighbor's pocket and put it into his own.   There is here no room left for discrimination between expressions that are material and those that are trivial and unimportant, or between mere opinions as to value and statements of facts; nor does the case permit us to consider what is allowable puffing, or the mere *gratis dicta* of a vendor upon which it is the folly of the vendee to rely.   We are glad to find that no Court has ever decided, and no *dictum* to that effect has ever fallen from any Judge, that a fraud like this is not cognizable by the common law.   It is well it should be known that for such frauds Courts of justice afford no protection, but will seize hold of them and give ample redress to the injured party.   These remarks are, of course addressed to the state of case as made by the pleadings; but we adopt generally the observations of Judge STORY, in *Doggett vs. Emerson*, 3 *Story's Rep.*, 733, where he says: " It is equally promotive of sound morals, fair dealing and public justice and policy, that every vendor should distinctly comprehend not only that good faith should reign over all his conduct in relation to the sale, but that there should be the most scrupulous good faith, an exalted honesty, or as it is often felicitously expressed *uberrima fides* in every representation made by him as an inducement to the sale.   He should literally in his

representation tell the truth, the whole truth and nothing but the truth.  If his representation is false in any one substantial circumstance, going to the inducement or essence of the bargain and the vendee is thereby misled, the sale is voidable and it is usually immaterial whether the representation be wilfully and designedly false, or ignorantly and negligently untrue.  The vendor acts at his peril, and is bound by every syllable he utters or proclaims, or knowingly impresses upon the vendee as a true or decisive motive for the bargain."

But it is argued the second count goes simply for a false representation of the *value* of *real estate* contracted to be sold, and hence falls within the exception as stated in *Medbury vs. Watson*, 6 *Met.*, 259, that " in actions on the case for deceit, there has always existed the exception that naked assertions, though known to be false, are not the ground of action as between vendor and vendee; and in regard to affirmations and representations respecting *real estate*, the maxim of *caveat emptor* has ever been held to apply.  When, therefore, a vendor of *real estate* affirms to the vendee that his *estate* is worth so much, or that he gave so much for it, that he has been offered so much for it, or has refused so much for it, such assertions, though known by him to be false, and though uttered with a view to deceive, are not actionable."  A careful examination, however, of this count will show that it does not fall within the terms of the proposition thus broadly stated.  The false repesentations it sets out as having been fraudulently made by the defendant, and relied on and acted upon by the plaintiff in making his purchase, are not merely the statement that he had actually paid $25,000 in money for an undivided fourth, but *that he had likewise paid* $10,000 *in money for working capital for the mines*.  This latter is a statement of a substantial and most material fact in this case, and is quite sufficient to remove it from the scope of the authority and exception relied on.  The fact that capital had been paid in or put up for the working of mines thus situated and owned by a concern like this, affording assurance that returns

for investments were likely to be soon realized, would naturally and unquestionably have great influence in inducing the purchase of shares, and if false and made fraudulently, and acted on with resulting damage, a case is presented which clearly comes under the reasoning and within the general principles on which actions for deceit have been maintained. We need not stop, therefore, to inquire, though authorities on the point are not wanting, whether the law is in every respect correctly stated in *Medbury vs. Watson.* We will remark, however, that it would be carrying the exception respecting the sale of *land* to the utmost verge of the law, to apply it to the sale and purchase of shares in a mining concern of this sort. We cannot shut our eyes to the fact that projects and speculations like these have been the fruitful source of frauds, and have brought ruin to thousands. No more efficient means have ever been devised by the crafty and cunning to work out their selfish ends, and defraud the credulous and confiding. In our opinion, the Courts should never regard with indulgence any false statements or representations made by the originators and promoters of such schemes for the purpose of inducing others to risk money in them.

Another point raised by the demurrer is that the third count contains no averment of loss or damage. This count, after setting out the false representations and making the other necessary allegations, concludes thus: "And the plaintiff says that *by means* of said false and fraudulent representations, the defendant *obtained* from the plaintiff the sum of $2,000, and the plaintiff is *entitled to recover* the same from the defendant." This, though not so in direct terms, is yet, we think, in substance an averment of loss and injury. If a man says another has *by fraud* obtained from him the sum of $2,000, and that he is entitled to recover it back from the party who thus obtained it, he must *mean* that he has been cheated and defrauded *out of that sum;* or, in other words, that he has suffered loss to that extent. Substance and not form is what the Code (Art. 75, secs. 3, 7,) makes essential in

pleadings. The demurrer cannot, therefore, stand on any ground, and was properly overruled.

The defendant's tenth prayer denies the right of the plaintiff to recover, because of a *variance* between the contract of sale stated in the declaration and that proved, provided the jury find the latter to have been a sale of the two shares on separate occasions, and not under one entire contract or agreement. But this is an action of *tort*, and the first and second counts of the *nar.* each contains averments that *by means* of the false and fraudulent representations alleged, the plaintiff, *after the making of the same and before this action*, was induced to and did become the purchaser of two shares in these mines and paid therefor the sum of $2,000, and was *thereby* defrauded of his money and suffered loss and damage, and the declaration concludes in the usual form, thus: " And the plaintiff claims $5,000." Under this, proof may be offered either of the sale of one share, or of two shares, at the same time, or at different times before suit brought, and the plaintiff may recover to the extent of damage proved to have been sustained by the direct consequence of the fraud. It is unlike the case of an action *ex contractu*, where the pleader sets out a contract *in hæc verba*, and then offers in evidence one materially variant from that so declared on.

Of the plaintiff's prayers the second and third were granted and are open for review. His fourth prayer set out in the appellants's brief is not in the record and therefore not before us. The second and third assume as their hypothesis that the defendant made to the plaintiff the representations stated in the declaration, *knowing them at the time to be false*, with intent to induce the plaintiff to purchase, and that the latter, induced thereby and believing them to be true, did purchase and pay his money, and on the finding of these facts by the jury, they claim as damages such amount as the jury may find he lost as the direct result of such false representations, not exceeding, however, the sum paid for the two shares .with interest thereon. This makes a case of *false representations fraudulently made*,

comprehended in the law on that subject as stated in the authorities already referred to. The qualification added to the third prayer, that it constitutes no defence to this action, that the defendant was *not benefited* or *expected to be benefited* by such false representations, is also supported by abundant authority, and indeed was one of the points expressly ruled in *Pasley vs. Freeman.*

That the defendant at the time he made the misrepresentations *believed* the mines to be worth $100,000, or were of substantial value, affords no excuse for fraudulently making them, and the fact that these elements are embodied in his first and second prayers was a sufficient reason for their rejection. We need not therefore consider the other objections to them made in argument. His third prayer that no misrepresentation by him of the price he had paid for his own interest in the mines, furnishes *of itself* a sufficient cause of action warranting a recovery in this suit, is a mere legal abstraction leading to no practical result, and could not have been granted in face of the evidence that they were false, and were made fraudulently and with intent they should be acted on, and were in fact so acted on by the plaintiff to his injury. Whatever good law there may be in his fourth prayer, he received the full benefit of it by the granting of his seventh and fifteenth prayers, and he has hence no cause to complain of its rejection. His sixth prayer, which asserts that the misrepresentations were not actionable unless the jury should find they were of facts material to the *real value of the property,* was rightly refused. The real value of the property was of no importance in the case except in relation to the question of damages. It had nothing to do with the misrepresentations. The materiality of these to the *contract of purchase* and not to the *value* of the thing purchased, was the question to be considered. The ninth prayer was abandoned in argument and the tenth has already been disposed of.

The twelfth and thirteenth prayers and the first exception present questions of like character. But little was said at bar

about these rulings and we considered them virtually abandoned by the appellant. They are however entirely correct. Where fraud is the gist of the action or subject of inquiry, great latitude of investigation is always allowed; fraudulent conduct, acts and declarations of the defendant of a similar character, at or about the same time, to or towards *third parties*, are admissible to show the *quo annimo* of the particular transaction. These may be proved by third parties, (and *a fortiori* by the cross-examination of the defendant himself,) and from them the jury have the right to infer fraud in the transaction complained of.

The fourteenth prayer which asserts that certain conduct of the plaintiff in acting and continuing to act as a shareholder in the association after he had knowledge of the fraud complained of in the declaration was a waiver of his right to institute this action, is answered by the case of *Whitney vs. Allaire*, 4 *Denio*, 554, approved and adopted by this Court in *Groff vs. Hansel*, 33 *Md.*, 166, where it is said : " In all cases of fraud the vendee who alone has the right of disaffirmance may remain silent and bring his action to recover damages for the fraud, or may rely on it by way of defence to the action of the vendor although there has been a full acceptance by him with knowledge of the defects in the property. An affirmance of the contract of the vendee with such knowledge merely extinguishes his right to rescind the sale. His *other remedies remain unimpaired.* The vendor can never complain that the vendee has not rescinded."

The defendant's fifth, seventh, eighth, eleventh, fifteenth, and sixteenth prayers were all granted, and in connection with the two granted at the instance of the plaintiff, the law of the case seems to have been fairly presented to the jury. It is clear that there has been no error committed in this respect to the prejudice of the defendant. We are of course not to be understood as intimating an opinion either way in respect to the proposition contained in the plaintiff's fourth prayer, which only appears in the brief of counsel for the

appellant. There was no agreement admitting it into the record, and we are not at liberty to consider it as affecting this case, nor have we considered it as an abstract proposition. It will be time enough to decide it when it is properly presented for review by this Court.

There are two views to be taken of the ruling in the second exception, either of which requires an affirmance of the judgment.

*First.* It is fair to infer from the terms of this exception and the evidence in the preceding one, which is made part of it, that the plaintiff as a witness had sworn to his *understanding* and *recollection* of what was said by the defendant in a certain interview between them, and that *at the time* of that conversation he understood the defendant to make the representations and statements set forth in the declaration, and that the defendant was then called to the stand and swore that he did not make the statements *so testified to* by the plaintiff, but others of a different import. This would present the not unusual occurrence of a misunderstanding at the time in reference to what was said in a conversation between two parties. If that was the state of the case then the *disclaimer* by the defendant's counsel of all purpose of impeaching the *integrity* of the plaintiff in his understanding or version of the defendant's representations as testified to, rendered the admission of Ahalt's testimony entirely harmless. That disclaimer made in open Court was an endorsement by the defendant himself of the credibility of the plaintiff, and was equivalent to an *admission* that he had truthfully stated what his understanding was of these statements *at the time they were made.* Ahalt's testimony was then merely a *corroboration* of that understanding which, by this disclaimer and admission, needed no corroboration, and could not by possibility have worked harm to the defendant. After this admission the defendant's counsel could not have argued such was not the understanding of the plaintiff in respect to these statements at the time of the interview, whether Ahalt's testimony was in or not, and hence

it is perfectly clear that though the ruling admitting it may have been erroneous, it affords no ground of reversal. This Court has frequently decided that where it appears the appellant has not been injured by the rulings of the Court below, the judgment will not be reversed though such rulings may be erroneous, and this is a most wise and salutary rule. If the record shows a case has been fairly tried and the law of it correctly stated to the jury by an inferior Court, it would be obstructing the course of justice, and trifling with the verdict and the rights of parties under it, if a reversal should follow from mere immaterial and harmless errors.

*Secondly.* If, on the other hand, the plaintiff swore in direct and positive terms that the defendant *did make* to him the representations stated, and that there could be no misunderstanding about it, and the defendant then came to the stand and swore in equally positive terms he *did not make them,* (and this is the only other construction that can be placed on the exception,) then a very different state of case is presented. When two parties thus contradict each other under oath respecting a matter occurring between themselves only, and about which they have equal means of knowledge and equal reason for accurate recollection, it is in vain to argue that one of them has not sworn falsely. The law holds it *perjury* for a witness to swear falsely in respect to what he *hears* as well as in respect to what he sees and does and says. The defendant's testimony went, therefore, to a *substantial impeachment* of the *credibility* of the plaintiff; that was its necessary and must have been its inevitable effect upon the minds of the jury, and having *offered it,* the defendant could not by disclaimer remove that impression. The fact that it went to the jury opened the way for corroboration, notwithstanding the disclaimer, and brings the case directly within that of *Cooke vs. Curtis,* 6 *H. & J.,* 93, which was followed in *Washington Fire Ins. Co. vs. Davison & Symington,* 30 *Md.,* 91. The first of these cases has remained unquestioned by the Courts of this State for nearly fifty years, and whilst it would not be

expedient or safe to extend or enlarge its application, yet it has been the uninterrupted practice of all Courts to receive their *own decisions* as of binding force, and on general principles of judicial propriety the solemn adjudications of an Appellate Court of last resort " ought to be approached with caution, and perhaps they should never be disturbed except to settle some great *rule of property* the public interest requires to be reviewed." *Hammond vs. Ridgely,* 5 *H. & J.,* 278; *Hammond's lessee, vs. Inloes,* 4 *Md.,* 138. No such considerations are here involved, and that case is, therefore, a binding authority on this Court, no matter what may be the law decided by Courts of other States or elsewhere, and whilst its doctrine is not to be expanded there ought to be no hesitation in applying it to a case falling directly within the *rule* and *principle* it establishes. That was done in 30 *Md.,* 91, and must be adhered to in the present case, for this is imperatively demanded by the importance of having the law fixed and certain. That the testimony of Ahalt was corroboratory of that of the plaintiff which had been thus substantially impeached appears to be plain. The fact that the plaintiff made the *same statement* of what the defendant had told him to Ahalt (who had been previously requested by the defendant to solicit the plaintiff to purchase an interest in these mines, and who at the time accompanied the plaintiff near to the office of the defendant, where the interview took place,) *immediately after* that interview, and not only before any *lis mota* or even distrust had arisen in the plaintiff's mind, but before, or at the very time he made the purchase and *paid part of his money therefor,* and when, it may reasonably be presumed, he was pleased with his bargain and considered the investment safe and profitable, could not be otherwise regarded by the jury than as a corroboration of his testimony given on the stand and a vindication of his assailed veracity and credibility. It is no extension of *Cooke vs. Curtis* to hold it applicable to this case, because the impeached witness was a party to the suit. The law allowing parties to testify (Act of 1864,

ch. 109,) says they " *shall be* competent and *compellable* to give evidence in the same manner as *other witnesses*," and the Legislature must interpose before the Courts can apply to them any other rule, with respect to the matter now under consideration, than is applicable to other witnesses.

But an examination of the authorities will show that *Cooke vs. Curtis* is not such a wide departure from principle or adjudged cases as has been asserted in argument. The authorities show it was at one time held allowable to prove in the first instance, as testimony in chief and before any impeachment, previous declarations to the same effect as the sworn testimony, because that, it was said, was merely *in support* of the oath of the witness, but this doctrine was overruled in England in the case of *Rex vs. Parker, 3 Doug.*, 242, decided in 1783, and mainly by Mr. Justice BULLER, and that ruling in no wise conflicts with *Cooke vs. Curtis*. But afterwards, in 1785, in the corrected edition of BULLER's *Nisi Prius* published in that year, (page 291,) the statement occurs without comment: " But though hearsay be not allowed as direct evidence, yet it may be admitted in corroboration of a witness' testimony, to show that he affirmed the same thing before on other occasions, and that he is still constant to himself." This gave rise to the *questio vexata* so much discussed in subsequent cases, and by subsequent text-writers. Most of that discussion in this country at least, has been over the question whether, when a witness has been impeached by proving he had made *different* statements from those sworn to, (a mode of impeachment universally admitted,) he could be confirmed by showing he had made *similar* statements at other times, and the decisions in many instances have turned upon the further question, whether the confirmatory declarations were prior or subsequent to those by which he was impeached. They were subsequent in *Ellicott vs. Pearl,* 10 *Pet.*, 412, and in *Conrad vs. Griffey,* 11 *How.*, 480, and in the latter case the circumstance was particularly adverted to, that being made subsequent to other statements of a different character, it was

30    v. 35

possible if not probable, the inducement to make them was for the very purpose of counteracting those first uttered. In the very able opinion of BRONSON, J., in *Robb vs. Hackley*, 23 *Wend.*, 50, it was admitted the confirmatory letter there offered in evidence was not proved to have been written when the transaction was recent, by any testimony save that of the impeached witness himself, and that letter might therefore have been prepared with a direct view to the litigation that ensued, and hence the case was "not so strong as it would have been on proof by a *third person* that the witness had made similar declarations *immediately after* the business was transacted." It was also conceded by GIBSON, C. J., in *Craig vs. Craig*, 5 *Rawle*, 91, to be still a vexed question, whether .such statements, no matter when made, may not be used to rebut evidence of self-contradiction and thus show the witness to have been sometimes consistent, and their admissibility is cogently advocated in *Henderson vs. Jones*, 10 *Sergt. & Rawle*, 322, and *Coffin vs. Anderson*, 4 *Blackf.*, 395.

It would seem to be a task as useless as tedious to review all the decisions of the Courts of the several States on this subject, because the case of *Cooke vs. Curtis* does not present the question whether a witness, when impeached by proof of his having made contradictory statements, can be corroborated in this way, and the Maryland Courts are *still* at liberty to follow what may be deemed the weight of authority elsewhere on this point.

In that case is appears the title to the land in controversy depended on the fact whether a certain child of Mrs. Cooke was born alive or not, and the defendant offered a deposition of Dr. Kingsmore, (which it was agreed should be read in evidence,) taken in 1819, in which he swore that in the year 1809 or 1810, or thereabouts he delivered Mrs. Cooke of a *female* child, that the child was born alive, that he assisted in dressing it and left it alive in five or six hours after its birth, that the child had arrived at maturity and gave as satisfactory and full evidence of life as any child could give, that it had been injured in the attempts to bring it into the world before he

McAleer *vs.* Horsey.

arrived, and he supposes these injuries produced its death after he went away. The plaintiffs then offered proof by several witnesses that the child to whose birth this deposition refers was not born alive, as therein stated, but dead, and that Dr. Kingsmore was not present at the birth of any of the children of Mrs. Cooke. This latter testimony the Court held had the effect of substantially impeaching the credibility of Dr. Kingsmore and laid a sufficient foundation for the introduction of the corroborating evidence by the defendant which was simply proof by a competent witness that Dr. Kingsmore *two or three days after* the birth of the child mentioned in his deposition, and before the date of that deposition, did *declare the same facts* he had deposed to. The Court then add the general remark, "And when the credibility of a witness is attacked by the opposite party, his prior declarations may be given in evidence to show his consistency," which must be restricted as meaning where the attack and impeachment is *in the mode* indicated by the facts of the case before them. So in the case now before us, the impeachment is in the same mode, and the corroborating evidence of the same character and proved in the same manner: if there be any difference the present is the stronger case in both particulars. Thus construed and limited it is not perceived the decision is greatly in conflict with adjudged cases of authority elsewhere, or violate any essential rule or principle of evidence, especially when it is remembered that the object of all evidence is the ascertainment of truth, and that the corroborating statements were made under circumstances when no perceivable moral influence existed to color or misrepresent them.

It follows there was no fatal error in this or any other ruling excepted to, and the judgment must be affirmed.

*Judgment affirmed.*

(Decided 19th March, 1872.)

STEWART, J., delivered the following dissenting opinion:

As the question is an important one in the law of evidence, I take occasion to record my dissent from the views of a ma-

jority of the Court as to the admissibility of Samuel Ahalt's testimony, referred to in the 2d bill of exceptions, to support and corroborate the testimony of the plaintiff, who was sworn as a witness, and whose character for truth was not impeached, directly or substantially.

I understand it to be agreed on all sides that the rule, or rather exception, recognized in *Cooke vs. Curtis,* 6 *H. & J.,* 93, and *Washington Fire Insurance Co. vs. Davison,* 30 *Md.,* 104, is to have but a limited operation, and sound reason forbids its further extension. The evidence now in question can be readily contra-distinguished from that admitted in the above cases.

The fact that parties can now be admitted as witnesses, affords no ground for the extension of the rule, but furnishes the greater reason for confining such testimony within the strictest limits. I do not see how such testimony can, upon any principle of reasonable construction, be considered in point of fact as corroborating evidence.

Where there is a disclaimer of any design to impeach the witness, and his reputation for truth is really not impeached, but the opposing evidence only offered to show the different recollection of another witness as to what occurred, it seems to me that in such case it cannot be fairly considered the witness is impeached. Unless the mere contradiction amongst witnesses is made ground for the introduction of corroborating testimony to support a witness, as if he were directly impeached, I do not perceive why such testimony should be admitted.

It is well settled that the contradictory statements of witnesses affords no ground of impeachment, and is not to be made the occasion for the introduction of corroborating testimony to support the character of a witness, as if in fact that were impeached for truth. *Vernon vs. Tucker,* 30 *Md.,* 462. Nor does the testimony offered come within the rule of admission as a part of the *res gestæ.*